## SHIPP *et al. vs.* DAVIS.

| 78 | 201 |
| 121 | 258 |

1. In an action on a promissory note made by a partnership, the suit being in favor of the payee against the representatives of one of the partners, and both partners being dead, the plaintiff having testified in his own behalf to the loss of the note, and then, on cross-examination, having testified to the execution and delivery of a similar note made by the plaintiff to the partnership, which note was pleaded as a set-off, he was competent to go on and explain (to the same extent as a disinterested witness might do) the circumstances under which the latter note was executed and delivered ; and as these circumstances connected it with the former, and also connected both notes with a book account between the contracting parties, his competency extended to a full explanation of the consideration of the notes, their relation to each other and to the account, the object and purpose of interchanging them, and the entire transaction of which the matters brought out in the cross-examination constituted a part.

2. The plaintiff having testified on cross-examination that he delayed bringing suit till just before the bar of the statute would have attached, was competent to explain the whole cause of that delay, including the fact that he was urging the surviving partner, then in life but since dead, to settle the demand.

3. Though the plaintiff (not being cross-examined on this point) may have been an incompetent witness to show what consideration he paid the partnership for certain drafts drawn by it in his favor, yet the presumption of law being that he gave value for the drafts, and there being no ground to infer that they or their proceeds were paid to him on the note in suit, and no evidence, direct or indirect, of that fact, his testimony showing the application of a part of the drafts to his book account against the partnership, and that he advanced cash for the balance, was not hurtful to the defendants, as the account unpaid, even if all the drafts had been applied to it, would still have been larger in amount than the note, thus leaving the whole of the note operative as continuing to represent a real debt.

4. Where the note sued upon was, in its inception, a security for a real debt on book account, and the note pleaded against it as a set-off never represented any debt whatever, but, under the name of an "offset," was obviously intended as a protection against having to pay the account, or some of it, twice, the latter note cannot prevail as a set-off against the former so long as the account, up to an amount equal to the amount of the note, remains unpaid.

5. Where the creditor had an election between two rights of action for the same debt, he may, after one of them is barred, maintain

a suit on the one not barred. That an account is "out of date," will not hinder a recovery upon a promissory note of the debtor, held by the creditor as a security for the account.

February 1, 1887.

Witness. Evidence. Debtor and Creditor. Set-off. Statute of Limitations. Before Judge WILLIS. Chatta-hoochee Superior Court. March Term, 1886.

B. F. Davis brought *assumpsit* against W. W. Shipp, as surviving partner of the firm of Shipp & McLester, based in part on a note and in part on an account. The defend-ant pleaded the general issue; the four years statute of limitations, barring accounts; *non est factum* as to the note; that the note was made by McLester without the knowledge or consent of defendant, without consideration and as a mere accommodation; set-off of a note for $700; and payment.

Shipp died, and his executors were made parties. On the trial, the jury found for the plaintiff $700 and costs. The defendants moved for a new trial on various grounds, which was refused, and they excepted. The other facts are sufficiently stated in the decision.

PEABODY & BRANNON, for plaintiffs in error.

Jos. F. Pou; C. J. THORNTON, for defendants.

BLECKLEY, Chief Justice.

This case was here on a former writ of error in 69 *Ga.* 297. The note declared upon and the one pleaded as a set-off were precisely alike, except as to the makers and the payees, respectively. The former note was made by Shipp & McLester, payable to Davis, or bearer; the latter by Davis to Shipp & McLester, or bearer. They bore the same date, which was in August, 1874, and each of them was due on the first of November thereafter. The record shows that Davis was a merchant, and that this firm was

his customer on a running account, consisting of many items, and amounting, when the notes were made, to much more than the one sum expressed in each note. McLester transacted most of the firm business, and he it was that gave the firm note to Davis to enable Davis to raise money by negotiating it. Though the note was given in consequence of the account, it was agreed, at the time, that it should not be entered on the books or credited upon the account; and as McLester had not examined it to his satisfaction, the settlement contemplated was postponed for a few days to await his convenience. He requested, however, that Davis should give his note to be held as an "offset" against the other, and this request Davis complied with. No settlement ever took place. Davis negotiated the note given to him, indorsing it, and then met his contract of indorsement, and received the note back from his transferee. McLester died, and Davis delayed bringing suit until the bar of the statute of limitations had attached to the account, and until it was about to attach to the note. He then sued Shipp as surviving copartner upon the note and a portion of the account, but prosecuted his action as to the note only. Shipp died, and his representatives were made a party defendant in his stead.

1. At the trial, Davis introduced himself as a witness to prove the loss of the note declared upon pending the action. After he had testified upon this point only, defendants' counsel proved by him, on cross-examination, the execution and delivery of the set-off note, and also certain facts that transpired after McLester's death touching the custody of that note. The question was then raised, whether the plaintiff was competent, while on the stand, to state as a witness in his own behalf the facts and circumstances which gave rise to and attended the execution and delivery of that note. The court ruled that he was, and under this ruling, the witness made a full explanation of the whole matter. It is not complained that he testified to anything which was in and of itself inadmissible evidence,

but only that the death of the other contracting parties would protect the defence from being affected by such evidence coming from him, he being, as it is insisted, an incompetent witness. The objection to his competency on this ground was duly made and formally overruled.

Of the note pleaded as a set-off, there was no denial in the pleadings, on oath or otherwise. For some reason, the counsel wanted to prove, and did prove, its execution and delivery. He may have thought the sections of the code relating to *non est factum* (§§3454, 2851, 3472) could not be applied to an instrument set up defensively, there being, under our system, no replication. At all events, he chose to assume the burden of showing execution and delivery, together with some later incidents of the note's history. The history of its origin was thus broached by the defendant's counsel himself, and that history laid open to full investigation; and the witness, while on the stand, could disclose the entire *res gestæ* of the execution and delivery. The circumstances were such that the existence of this note could not be adequately accounted for without explaining the existence of the other, nor the existence of the other without referring to the book account. The three were tied together in one knot of history, and what the witness did was to expound the knot, and show how the combination came to be made, and what were the several elements of the several things combined. In so doing, he explained and accounted for the acts of signing and delivering, and showed the consideration involved in the transaction, and, incidentally, the consideration of both notes. All this he did just to the extent that a disinterested witness might have done when examined in rebuttal to a cross-examination. There was no recurrence to the subject-matter of the examination in chief. That related to the loss of the other note, and that alone, and was not for information of the jury, but of the court, being designed to lay the foundation for secondary evidence touching the contents of the lost instrument. Indeed, it might be urged

that, as to the substance of the case, the plaintiff was not a witness in his own behalf at all until after the defendants had adopted him as their witness. Their counsel it was who first examined him upon any fact whatever that went to the substance of the controversy, or that the jury had to deal with, and the counsel began his inquiry by entering upon a transaction between the witness and the partnership whilst both partners were living. It would hardly be a misnomer to call this an examination in chief. But we are content to treat it as a cross-examination, and to rule on it in that aspect. The exact ruling we make is formulated in the first head-note to this opinion.

2. Nor was the plaintiff incompetent to explain why he delayed bringing suit, although a part of his reason was that he was urging the surviving partner to settle. The defendants brought out the fact of delay in their so-called cross-examination, and the testimony objected to went to explain why the delay occurred. If a part of the cause of delay was admissible (and that it was is conceded by there being no objection made to it), the whole cause of it was admissible. The forbearance to sue and the efforts to obtain a settlement were contemporaneous, and were related as an effect is related to a part of its cause. The effect had no relevancy to the issue, save as an indication of some cause, and the defendants having drawn out the effect, the plaintiff was entitled to refer it to its true cause and to develop the whole thereof. Why was the delay made a subject of examination if the witness was not competent to explain it as well as to avow it?

3. Nothing was brought out on cross-examination of the plaintiff which referred directly or remotely to the drafts which were afterwards introduced by the defendants. The court, however, permitted him to return to the stand and show what consideration the firm received for these drafts; that is, that two of them were credited on the book account and one of them was paid for in cash. The drafts were drawn by the firm on another firm, in favor of Davis, and

were payable legally on demand or at sight, no time of payment being expressed. They bore date respectively October 12th and December 14th, 1874, and February 15th, 1875, and in the aggregate amounted to the same sum as the principal of the note sued upon. This coincidence was the only fact which tended to relate them to the note otherwise than through the account; and the two larger of them were drawn after the note matured and had for sometime borne interest. The drafts were, therefore, not sufficient to discharge the note had they been applied to it. But they were not so applied; that was clear; and there was not the faintest trace of any agreement or direction so to apply them. Under our law, they imported a consideration as between the drawers and the payee, and had the drawers been sued upon them after dishonor, it would not have devolved on the payee to show that credit had been given for them either on the note or the account. He might have rested on the general presumption of law that he paid full value for them; otherwise, until the contrary appeared. That presumption obtained here until he testified ; and from his testimony, it appeared that credit was given for them on his book-account against the drawers to the extent of five-sevenths of their amount, and that as to the other two-sevenths, he paid cash which never went upon the books. In so far as this evidence rebutted the general presumption of law, it operated rather against the plaintiff than in his favor, and therefore did the defendants no harm. But had credit been given upon the books for the two-sevenths of the drafts not credited (and we are sure that no view of the circumstances would warrant more than that), the account would still have been, in the final outcome, larger than the note, and so a balance upon the account would have remained unpaid sufficient to justify a recovery upon the note in full.

The result is, that granting the incompetency of the plaintiff to testify as a witness touching these drafts (and considering the way the examination commenced, it is

doubtful whether he was incompetent), the admission of the testimony was not cause for granting a new trial. See third head-note.

4. The next point strikes at the vitals of the controversy. The court declined to charge the jury that if one note was given as an "offset" to the other until a final settlement was had, and if no final settlement had taken place, then the former is an "offset" to the latter. This charge, if given, would have misled the jury. They would have understood it as leaving scarcely anything to investigate, except the fact of the agreement about "offset;" whereas, according to the true legal effect of that agreement, under the circumstances, it may be conceded to have been made, and may receive the most favorable interpretation for the defendants which the facts will bear, and still the plaintiff could and ought to recover. There was no pretence that any settlement had been made. The failure to settle was one of the troubles brought about, not by the plaintiff, but by the partnership. The plaintiff was ready to settle when the notes were given, and the postponement was not at his instance, but at the instance of the acting partner, and was assented to for his convenience. So far as appears, no subsequent offer to settle had ever been made by the partnership, or either of the partners, and there is no hint that the plaintiff was unwilling to settle, or ever failed to be ready. The failure to settle cannot count against the plaintiff, and so his rights are to be measured now by what they were in the beginning. What were these rights? The partnership was his debtor. He had an open account against it, upon which he had a right of action. The partnership had no debt against him; he owed it nothing. It gave him a note covering a portion of the account in amount, but not paying any of it. There was an express agreement that it should not be credited on the account, and even if it had, in fact, been credited, it would not have operated as payment without an agreement precisely to the reverse of the one entered into. 71 *Ga.* 450. There was

no purpose or intention that the note was to remain in the plaintiff's hands inactive and inoperative. He wanted it for immediate use, as a valid, absolute, unconditional undertaking to pay to himself or the bearer the amount expressed in it on the first of November following. It was given with the knowledge and intention of the active partner, and therefore of the partnership, that he would so treat it. The consideration was not any particular part of the book account, but the whole of it; it was the fact that the partnership owed that account. The note was negotiated as it was intended to be, but it was a binding note in all respects before it was negotiated, there being an existing debt for much more than the amount of it to furnish a consideration. As soon as the note was given and accepted, there were two contracts on the part of the partnership touching that debt: one implied on the account, to pay the whole of it; the other, express in the note, to pay a part of it.

The giving of the note was no extinguishment of the right of action on the account; the existence of a right of action on the account was no obstacle to an action on the note. As between the parties themselves, payment of the note would extinguish the account *pro tanto,* and payment of the account would extinguish both; that is, the whole debt. As long as anything was left due on the account, the note would be good for that much. Stripped of the cobwebs woven about the transaction, the case is but the very common one of a creditor having his debtor's note as a security for the payment, in part, of his debtor's account. And with this view, the note pleaded as a set-off, is, in the light of all the competent testimony in the record, both the interested and the disinterested, quite consistent. This latter note represents no debt, and never did. Yet it was good, and remains good, for the purpose for which, in legal effect, it was given, to-wit, to prevent the plaintiff from collecting any part of his debt more than once. That was and is its office, and whenever and wherever it is needed

to subserve such a purpose, it can be used to " offset " either the note or the account, or both.    But it cannot be used to hinder the collection of any part of the debt once only.    It is morally certain that the partnership never discharged this note by settling or otherwise.    If it was to be satisfied by a settlement, why was the settlement not made ?

5. The bar of a remedy on the account by lapse of time is simply the loss of one of the plaintiff's rights of action. The debt survives though that remedy for its recovery has perished.    But on the note, there was another remedy for so much of the debt as the note embraces, and to make available this latter remedy, as far as it will go, is the object of the present suit.    8 *Ga.* 325.

6. Any other points made in the motion for a new trial, or in the argument at the bar, are submerged by the strong current of legal evidence in favor of the verdict.    The finding of the jury was correct, and there was no error in overruling the motion for a new trial.

Judgment affirmed.